1  BETSY C. MANIFOLD (182450)
   RACHELE R. BYRD (190634)
2  ALEX J. TRAMONTANO (276666)
   **WOLF HALDENSTEIN ADLER**
3    **FREEMAN & HERZ LLP**
   750 B Street, Suite 1820
4  San Diego, CA 92101
   Telephone: (619) 239-4599
5  Facsimile: (619) 234-4599
   manifold@whafh.com
6  byrd@whafh.com
   tramontano@whafh.com
7
8  *Attorneys for Plaintiff*

9  [Additional Counsel on Signature Page]

10            **UNITED STATES DISTRICT COURT**
            **NORTHERN DISTRICT OF CALIFORNIA**
11

12  BORIS BENKOVSKI, Derivatively on Behalf of
    Nominal Defendant EQUINIX, INC.,
13
                    Plaintiff,                    Case No. _____
14
         v.                                       **VERIFIED SHAREHOLDER**
15                                                **DERIVATIVE COMPLAINT**
    CHARLES J. MEYERS, ADAIRE FOX-MARTIN,
16  NANCI CALDWELL, GARY HROMADKO,                **DEMAND FOR JURY TRIAL**
    THOMAS OLINGER, CHRISTOPHER PAISLEY,
17  JEETU PATEL, SANDRA RIVERA, FIDELMA
    RUSSO, PETER VAN CAMP, and KEITH D.
18  TAYLOR,

19                  Defendants,

20          and

21  EQUINIX, INC.,

22                  Nominal Defendant.

23

24

25

26

27

28
─────────────────────────────────────────────
              VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff Boris Benkovski ("Plaintiff"), by and through his undersigned attorneys, brings this derivative complaint for the benefit of nominal defendant Equinix, Inc. ("Equinix" or the "Company"), against current and former members of the Company's Board of Directors (the "Board") and certain of its executive officers seeking to remedy the Individual Defendants' (defined below) breach of fiduciary duties and violations of federal law. Plaintiff alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of Defendants' publicly available documents, filings with the United States Securities and Exchange Commission ("SEC"), press releases published by and regarding Equinix, legal filings, news reports, securities analysts' reports about the Company, the securities class action *Chan v. Equinix, Inc., et al.,* Case No. 3:24-cv-02656-VC (N.D. Cal.) (the "Securities Class Action"), and other publicly available information.

## NATURE OF THE ACTION

1.     This is a shareholder derivative action brought by Plaintiff on behalf of Equinix against certain of its current and former officers and members of the Company's Board (the "Individual Defendants")[1] for breaches of their fiduciary duties between at least May 3, 2019 and March 24, 2024, inclusive (the "Relevant Period"), and the federal securities laws, as set forth below.

2.     Equinix describes itself as a digital infrastructure company which operates interconnected data centers around the world. In 2015, the Company converted into a real estate investment trust ("REIT").[2]

---

[1] Individual Defendants are Charles J. Meyers ("Meyers"), Adaire Fox-Martin ("Fox-Martin"), Nanci Caldwell ("Caldwell"), Gary Hromadko ("Hromadko"), Thomas Olinger ("Olinger"), Christopher Paisley ("Paisley"), Jeetu Patel ("Patel"), Sandra Rivera ("Rivera"), Fidelma Russo ("Russo"), Peter Van Camp ("Van Camp"), and Keith D. Taylor ("Taylor"). The Individual Defendants, together with Equinix, are "Defendants."

[2] Q20, 2Q20, 3Q20, 1Q21, 2Q21, 3Q21, 1Q22, 2Q22, 3Q22, 1Q23, 2Q23, 3Q23, and Forms 10-K for FY19, FY20, FY21, FY22 and FY23.

3.      As of April 2024, the Company owned and operated 260 data centers housing large-scale computer systems and maintained operations in 33 countries. The Company's "colocation" data center offerings provide the components required by a customer to house its IT infrastructure or equipment, including space, power, cooling, internet bandwidth, and physical security to several customers in a particular data center. Customers, meanwhile, typically provide their own servers and computing hardware to be housed in Equinix's data centers. For the quarter ended September 30, 2024, Equinix derived nearly 70% of its total revenues from colocation offerings.

4.      The Company also provides "interconnection" solutions to customers designed to connect businesses directly, securely and dynamically within and between Equinix's data centers across its global platform. For the quarter ended September 30, 2024, Equinix derived approximately 17.4% of its total revenues from its interconnection and data exchange offerings.

5.      As is common in the REIT industry, Equinix reports Generally Accepted Accounting Principles ("GAAP") and various non-GAAP financial measures. Non-GAAP reporting measures reported by Equinix include funds from operations ("FFO") and adjusted funds from operations ("AFFO"), as well as AFFO per share. AFFO is a financial performance measure intended to track the net amount of cash that flows into a REIT from regular, ongoing business activities.

6.      One metric key to the Company's AFFO methodology is the treatment of capital expenditures, often referred to as "CapEx." Recurring CapEx, which reduces AFFO, typically refers to capital expenditures made on a regular basis to support ongoing revenue. Non-recurring CapEx, meanwhile, generally applies to one-time expenses that are unlikely to repeat and does not reduce AFFO. The classification of capital expense, therefore, had a direct impact on the amount of AFFO reported to the market.

7.      During the Relevant Period, the Individual Defendants caused the Company to engage in a scheme by which recurring CapEx was mischaracterized as non-recurring CapEx, thereby inflating Equinix's AFFO and AFFO per share metrics and causing the Company's financial reports to be materially misleading.

8.      The truth exposing Defendants' scheme was revealed to the market through gradual

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

public disclosures. On March 20, 2024, investment research firm and short-seller Hindenburg Research released a report published a report titled "Equinix Exposed: Major Accounting Manipulation, Core Business Decay And Selling An AI Pipe Dream As Insiders Cashed Out Hundreds of Millions" (the "Hindenburg Report"). The Hindenburg Report claimed that Equinix manipulated its accounting for AFFO, a key profitability metric for REITs, by misclassifying its recurring CapEx, or "maintenance CapEx," as nonrecurring "growth" CapEx, giving the appearance that the Company's cost to maintain its revenue base was lower than what it actually was.

9.      On this news, the Company's stock price declined from a close of $844.58 on March 19, 2024, to a close of $824.88 on March 20, 2024.

10.      On March 25, 2024, Equinix issued a press release announcing that the Audit Committee of the Board had commenced an independent investigation to review the matters referenced in the Hindenburg Report. The Company also announced that, shortly after the release of the Hindenburg Report, Equinix received a subpoena from the U.S. Attorney's Office for the Northern District of California. The press release further stated: "We believe we have earned the trust of our investors - and all our stakeholders - by reliably delivering on our commitments with integrity and meeting the requirements of our customers, as we have demonstrated throughout our 25-year history."

11.      On this news, the price of the Company's common stock declined again, from a closing price of $800.97 on March 22, 2024, to $792.52 on March 25, 2024.

12.      On May 8, 2024, the Company issued a press release announcing, among other things, that the Audit Committee's investigation was substantially completed and that the Audit Committee "did not identify any accounting inconsistencies or errors requiring an adjustment to, or restatement of, previously issued financial statements or non-GAAP measures." The press release also informed investors that on April 30, 2024, Equinix received a subpoena from the SEC.

13.      On May 9, 2024, the Company announced that it had added a new category of non-recurring CapEx to its disclosures, referred to as "redevelopment CapEx," to track investments in certain data centers that had been operating for 20 years or longer.

14.     As set forth herein, throughout the Relevant Period the Individual Defendants breached their fiduciary duties by issuing, causing the issuance of, and/or failing to correct the materially false and/or misleading statements and omissions of material fact to the investing public. Specifically, the Individual Defendants failed to disclose: (i)  the Company regularly overstated AFFO (and AFFO/share) by improperly classifying recurring CapEx as non-recurring CapEx expenses in violation of its own stated guidelines and SEC rules and regulations; (ii) the improper classification of CapEx materially misled investors into believing that Equinix was meeting, or beating, its AFFO guidance; and (iii) Equinix lacked adequate internal controls. As a result, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

15.     Additionally, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain adequate internal controls.

16.     As a result of the foregoing, the Securities Class Action was filed against the Company and Defendants Meyers, the Company's former Chief Executive Officer ("CEO"), and Taylor, the Company's Chief Financial Officer ("CFO"), on May 2, 2024. On January 6, 2025, the court in the Securities Class Action denied in part and granted in part defendants' motion to dismiss (ECF No. 67).

17.     As a direct and proximate result of the Individual Defendants' misconduct, the Company has incurred significant financial losses, including the cost of defending and paying class-wide damages in the Securities Class Action, as well as additional losses, including reputational harm and loss of goodwill.

18.     Moreover, in light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action and Defendants' liability in the Securities Class Action, their being beholden to each other, their longstanding business and personal relationships with each other, and their not being disinterested and/or independent directors, a majority of Equinix's Board cannot consider a demand to commence

litigation against themselves and the other Individual Defendants on behalf of the Company with the requisite level of disinterestedness and independence. Accordingly, Plaintiff did not make a demand on the Board because, as further detailed herein, demand would be a futile and useless act.

## JURISDICTION AND VENUE

19.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and Section 27 of the Securities Exchange Act of 1934 (the "Exchange Act") over the claims asserted herein for violations of Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a) and SEC Rule 14a-9 (17 C.F.R. § 240.14a-9)) promulgated thereunder.

20.    This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

21.    This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

22.    In connection with the acts, conduct and other wrongs complained of herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail, and the facilities of a national securities market.

23.    Venue is proper in this District pursuant to Section 27(a) of the Exchange Act and 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the acts and omissions alleged herein, including the dissemination of materially false and misleading information, occurred in this District, Equinix is headquartered in this District, Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District, and the Securities Class Action is pending in this District.

## PARTIES

*Plaintiff*

24.    Plaintiff is, and has been at all relevant times, a shareholder of Equinix.

*Nominal Defendant*

25.    Nominal Defendant Equinix is incorporated under the laws of Delaware with its principal executive offices located at One Lagoon Drive, Redwood City, California 94065. Equinix's

common stock is traded on the Nasdaq Stock Market ("Nasdaq") under the ticker symbol "EQIX."

***Individual Defendants***

26.     Defendant Meyers has served as a member of the Board since September 2018 and as Executive Chairman since June 2024. Defendant Meyers previously served as CEO and President of the Company from September 2018 to June 2024. As set forth in the proxy statement filed by the Company on April 12, 2024 (the "2024 Proxy"), Defendant Meyers received $23,927,452 in compensation from the Company in 2023. During the Relevant Period, while in possession of material and nonpublic information, Defendant Meyers sold 149,933 shares of Equinix common stock for total proceeds of more than $107 million. Defendant Meyers is also named as a defendant in the Securities Class Action.

27.     Defendant Fox-Martin has served as the Company's CEO and President since June 2024 and has served as a member of the Board since January 2020. Defendant Fox-Martin also serves as a member of the Board's Stock Award Committee. Prior to becoming CEO, she served as a member of the Board's Nominating and Governance Committee. According to the 2024 Proxy, Defendant Fox-Martin received $334,663 in compensation from the Company in 2023. The 2024 proxy further stated that Fox-Martin "no longer considered to be an independent director in connection with her planned succession to the role of chief executive officer and president."

28.     Defendant Caldwell has served as a member of the Board since December 2015. Defendant Caldwell also serves as Chair of the Board's Nominating and Governance Committee and as a member of the Talent, Culture and Compensation Committee. According to the 2024 Proxy, Defendant Caldwell received $357,163 in compensation from the Company in 2023.

29.     Defendant Hromadko has served as a member of the Board since June 2003. Defendant Hromadko also serves as Chair of the Board's Finance Committee and Real Estate Committee, and as a member of the Nominating and Governance Committee. According to the 2024 Proxy, Defendant Hromadko received $377,163 in compensation from the Company in 2023.

30.     Defendant Olinger has served as a member of the Board since January 2023. Defendant Olinger also serves as a member of the Board's Audit Committee, Finance Committee,

and Real Estate Committee. According to the 2024 Proxy, Defendant Olinger received $438,459 in compensation from the Company in 2023.

31.    Defendant Paisley has served as a member of the Board since July 2007 and as Lead independent Director since February 2012. Defendant Paisley also serves as Chair of the Board's Audit and as a member of the Nominating and Governance Committee, Finance Committee, and Real Estate Committee. According to the 2024 Proxy, Defendant Paisley received $413,163 in compensation from the Company in 2023.

32.    Defendant Patel has served as a member of the Board since June 2022. Defendant Patel also serves as a member of the Board's Talent, Culture and Compensation Committee. According to the 2024 Proxy, Defendant Patel received $336,163 in compensation from the Company in 2023.

33.    Defendant Rivera has served as a member of the Board since October 2019. Defendant Rivera also serves as Chair of the Board's Talent, Culture and Compensation Committee and as a member of the Stock Award Committee. According to the 2024 Proxy, Defendant Rivera received $344,663 in compensation from the Company in 2023.

34.    Defendant Russo has served as a member of the Board since June 2022. Defendant Russo also serves as a member of the Board's Audit Committee. According to the 2024 Proxy, Defendant Russo received $339,663 in compensation from the Company in 2023.

35.    Defendant Van Camp has served as Special Advisor to the Board since June 2024, having served as a member of the Board since May 2000 and as Executive Chairman from 2007 to June 2024. Defendant Van Camp previously served as CEO of the Company from 2000 to 2007 and as interim CEO and President from January 2018 to September 2018. According to the 2024 Proxy, in fiscal year ("FY") 2023, Defendant Van Camp received compensation from the Company equal to "$400,000 in salary and 75% of his salary in annual incentive compensation (paid in fully vested RSUs), and was granted 1,397 RSUs, with the same service and performance vesting requirements as those granted to our named executive officers," for his service as Equinix's executive chairman.

36.    Defendant Taylor has served as the Company's CFO since 2005. According to the

2024 Proxy, Defendant Taylor received $11,642,804 in compensation from the Company in 2023. During the Relevant Period, while in possession of material and nonpublic information, Defendant Taylor sold 54,287 shares of Equinix common stock for total proceeds of more than $39.5 million. Defendant Meyers is also named as a defendant in the Securities Class Action.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

37.    By reason of their positions as officers and/or directors of Equinix, and because of their ability to control the business and corporate affairs of Equinix, the Individual Defendants owed Equinix and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Equinix in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Equinix and its shareholders.

38.    Each director and officer of the Company owes to Equinix and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligation of fair dealing.

39.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of Equinix, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

40.    To discharge their duties, the officers and directors of Equinix were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

41.    Each Individual Defendant, by virtue of his or her position as a director and/or officer owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of Equinix, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants

were aware or should have been aware posed a risk of serious injury to the Company.

42. As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the Nasdaq, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, financial statements, products, management, internal controls, earnings, and present and future business prospects, including the dissemination of false and/or materially misleading information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful, accurate, and fairly presented information.

43. To discharge their duties, the officers and directors of Equinix were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Equinix were required to, among other things:

(i) Ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of California, Delaware, and the United States, and pursuant to Equinix's own Code of Business Conduct (the "Code of Conduct") and Code of Ethics for Chief Executive Officer and Senior Financial Officers (the "Officer Code");

(ii) Conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(iii) Remain informed as to how Equinix conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such

conditions or practices;

(iv) Establish and maintain systematic and accurate records and reports of the business and internal affairs of Equinix and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(v) Maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Equinix's operations would comply with all applicable laws and Equinix's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(vi) Exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(vii)    Refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(viii)    Examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

44.    Each of the Individual Defendants further owed to Equinix and the shareholders the duty of loyalty requiring that each favor Equinix's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

45.    At all times relevant hereto, the Individual Defendants were the agents of each other and of Equinix and were at all times acting within the course and scope of such agency.

46.    Because of their advisory, executive, managerial, and directorial positions with Equinix, each of the Individual Defendants had access to adverse, non-public information about the

10
VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Company.

47.    The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Equinix.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

48.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

49.    The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty and unjust enrichment.

50.    The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company, purposefully, recklessly, or negligently, to conceal material facts, fail to correct such misrepresentations, and violate applicable laws.

51.    In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants, who are directors of Equinix, was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

52.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

53.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Equinix and at all times acted within the course and scope of such agency.

### EQUINIX'S CODE OF CONDUCT AND OFFICER CODE

54.     Equinix's Code of Conduct begins with a joint letter from Defendants Fox-Martin and Meyers stating that the Company's "adherence to the highest ethical standards reflects the caliber of our people and the strength of our culture."

55.     The Code of Conduct applies to every Equinix officer, director, and employee. Employees who violate the Code of Conduct are subject to "disciplinary action up to and including termination of employment."

56.     With respect to "Conflicts of Interest," the Code of Conduct provides, in relevant part:

> Each of us has an obligation to do what is right for Equinix. This means avoiding situations that create–or even appear to create–a conflict between our own personal interests and the Company's interests. A conflict of interest is anything that impedes objectivity or effectiveness in our job performance or decisions we make on behalf of Equinix. Transparency is essential to avoiding conflicts of interest.

57.     In a subsection addressing "Records and record-keeping," the Code of Conduct provides:

> Our records are our corporate memory. These records provide evidence of actions and decisions. They contain information and data that are critical to the success and continuity of our business and they enable us to meet our legal and regulatory obligations. Records consist of all forms of information we create or receive that contain information about our Company or our business activities. Examples of Company records include paper documents, email and electronic files that are stored on disk, tape or any other medium.
>
> We have a responsibility to be honest and accurate in what we report and record in all Equinix documents, including accounting records, time cards, expense reports, safety records, business records, etc. If you see or suspect misconduct in our financial records, notify your manager and contact the Compliance Office.
>
> All records are the property of Equinix and should be managed in accordance with our Global Record Management Policy to ensure we are all following the same approved

processes for retaining, storing and destroying our Company records. From time to time, the legal team may ask employees to retain certain records for specific legal purposes. It is important to follow these instructions carefully to avoid legal implications.

58.    In a subsection titled "Speaking on Behalf of Our Company," the Code of Conduct states:

Providing information to the public that is complete, consistent and accurate is crucial to maintaining our reputation. It is also a requirement for complying with regulatory and legal obligations. Unless you have been authorized to do so, do not speak on behalf of the Company. Instead, refer the individual to Equinix's Corporate Communications team.

59.    The Code of Conduct further contains a section titled "Our Commitment to the Law," stating, in relevant part:

Being an ethical and honest company also means obeying the law. As a global company, we must comply with the laws in all the places we do business. And as Equinix employees, we are responsible for understanding and complying with all laws and regulations that affect our jobs.

*          *          *

INSIDE INFORMATION AND SECURITIES TRADING

You must not buy or sell Equinix stock if you possess any "material information" about the Company that has not been publicly disclosed (also known as "inside information"). Similarly, if you are aware of inside information about other companies, such as customers or vendors, you must not buy or sell the securities of that company. If you share inside information or provide insider "tips" to a third party who then trades on that information, you may be held responsible for the illegal trade. You may also be liable for trades made by someone else based on confidential information you shared with an outside party–including family members and friends. If you share inside information that influences a family member or friend to buy or sell Equinix stock, you may be criminally liable as a "tipper" under federal securities laws.

Equinix considers it improper for those who are employed by or associated with Equinix to engage in short-term or speculative transactions in Equinix's securities or in other transactions in Equinix's securities that may lead to inadvertent violations of the insider trading laws. Accordingly, your trading in Equinix securities is subject to the additional guidelines as more fully described in the Equinix Securities Trading Policy.

13
VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

60.     In addition to the Code of Conduct, Equinix's Officer Code applies to the Company's CEO and senior financial officers.

61.     The Officer Code provides, among other things, that the CEO and senior financial officers are subject to the following additional policies and procedures:

2.  The CEO and all senior financial officers are responsible for full, fair, accurate, timely and understandable disclosure in reports and documents that the Company files with, or submits to, the Securities and Exchange Commission, and in other public communications made by the Company. Accordingly, the CEO and each senior financial officer must (a) promptly to bring to the attention of the Audit Committee of the Company's Board of Directors any material information of which he or she becomes aware that affects the disclosures made by the Company in its public filings and (b) otherwise assist the Audit Committee in fulfilling its responsibilities.

3.  The CEO and each senior financial officer must promptly bring to the attention of the Audit Committee any information that he or she may have concerning (a) significant deficiencies in the design or operation of internal controls that could adversely affect the Company's ability to record, process, summarize and report financial data or (b) any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's financial reporting, disclosures or internal controls.

4.  The CEO and each senior financial officer must promptly bring to the attention of the General Counsel or CEO and to the Audit Committee any information that he or she may have concerning any violation of this Code or the Company's Code of Business Conduct, including any actual or apparent conflicts of interest between personal and professional relationships, involving any management or other employees who have a significant role in the Company's financial reporting, disclosures or internal controls.

5.  The CEO and each senior financial officer must promptly bring to the attention of the General Counsel or CEO and to the Audit Committee any information that he or she may have concerning evidence of a material violation, by the Company or any agent of the Company, of the securities or other laws, rules or regulations applicable to the Company and the operation of its business.

## EQUINIX'S AUDIT COMMITTEE CHARTER

62.     Equinix's Audit Committee Charter states that the purpose of the Audit Committee is to "oversee the Company's accounting practices, system of internal controls, audit processes, and financial reporting processes."

63.     In a subsection outlining the Audit Committee's responsibilities and authority with

respect to "Processes, Controls and Risk Management," the Audit Committee Charter provides:

1. Reviewing periodically the Company's financial reporting processes and disclosure controls and processes, based on consultation with the Company's management, independent auditors, counsel and the internal auditors;

2. Reviewing periodically the adequacy and effectiveness of the Company's internal control policies and procedures, based on consultation with the Company's management, independent auditors and the internal auditors;

3. Reviewing the reports prepared by management, and attested to by the Company's independent auditors, assessing the adequacy and effectiveness of the Company's internal controls and procedures, prior to the inclusion of such reports in the Company's periodic filings as required under the rules of the SEC;

4. Discussing areas of risk exposure related to the Committee's purpose, as well as certain of the Company's other major financial and non-financial risk exposures as agreed to with management and other Board committees, and the steps management has taken to monitor and control such exposures, based on consultation with the Company's management, independent auditors and the internal auditors;

64.    With respect to "Internal Auditors," the Audit Committee Charter states that the Audit Committee's responsibilities include:

14. Overseeing the activities of the Company's internal audit function, including review of the responsibilities, budget, staffing and effectiveness of the internal audit function, and review of any process of appointment and/or replacement of the senior employee in charge of the internal audit function; [and]

15. Meeting separately with the internal audit function out of the presence of the Company's management and reviewing any significant reports to the Company's management prepared by the internal audit function and management's responses;

65.    With respect to "SEC Reports and Other Disclosure," the Audit Committee Charter states that the Audit Committee's responsibilities and authority shall include:

16. Reviewing with:

   a. Management and the Company's independent auditors, before release, the audited financial statements and unaudited interim financial statements; and

   b. Management and the Company's independent auditors, before release, the Company's earnings announcements or financial releases and Management's Discussion and Analysis (MD&A) in the Company's annual report on Form 10-K and quarterly reports on Form 10-Q;

17. Recommending to the Board whether the audited financial statements should be included in the Company's annual report on Form 10-K;

18. Preparing the Audit Committee report that the SEC rules require to be included in the Company's annual proxy statement;

19. Directing the Company's independent auditors to review, before filing with the SEC, the Company's interim financial statements included in quarterly reports on Form 10-Q, using professional standards and procedures for conducting such reviews;

20. Overseeing compliance with the disclosure requirements of the SEC, including disclosure of information regarding auditors' services and audit committee members, member qualifications and activities;

66.    Additionally, the Audit Committee Charter states that the Audit Committee shall be responsible for "[r]eviewing, approving and monitoring the Company's code of ethics for the Chief Executive Officer and senior financial officers in accordance with the applicable rules of Nasdaq and the SEC[.]"

## SUBSTANTIVE ALLEGATIONS

67.    Equinix's colocation data centers purport to offer customers secure, reliable and robust environments, including space and power, necessary to aggregate, distribute, and connect information and data. Offerings in these data centers are typically billed based on the space and power a customer consumes, are delivered under a fixed duration contract, and generate monthly recurring revenue. Customers can then install and operate their owned or leased servers within specific cabinets or business suites at an Equinix data center.

68.    On January 1, 2015, Equinix converted from a C Corporation to a REIT for federal income tax purposes. Following the conversion, Equinix began reporting various non-GAAP measures to its investors, including FFO and AFFO.

69.    According to Company public filings, funds from operations ("FFO") were comprised of net income, excluding: (i) gains (or losses) from disposition of real estate property; (ii) impairment charges related to depreciable real estate fixed assets; plus (i) real estate related depreciation, (ii) amortization expense, and (iii) after adjustments for unconsolidated joint ventures ("JVs"), and non-controlling interests.

70.     Adjustments to FFO, and the resulting AFFO metric, are intended isolate cash activity included within the straight-lined or amortized results in the consolidated statement of operations. Specifically, AFFO represents FFO excluding depreciation and amortization expense on non-real estate assets, accretion, stock-based compensation, restructuring charges, impairment charges, transaction costs, an installation revenue adjustment, a straight-line rent expense adjustment, a contract cost adjustment, amortization of deferred financing costs and debt discounts and premiums, gain (loss) on debt extinguishment, an income tax expense adjustment, recurring capital expenditures, net income (loss) from discontinued operations, net of tax, and adjustments from FFO to AFFO for unconsolidated joint ventures' and noncontrolling interests' share of these items.

71.     Accordingly, the determination of capital expenditures as recurring versus non-recurring had a direct impact on reported AFFO. Capital expenditures deemed recurring were subtracted from FFO in calculating AFFO, while capital expenditures deemed non-recurring were not.

72.     Prior to the REIT conversion, Equinix reported in a presentation dated July 30, 2014 that, under a new methodology for classifying capital expenditures, only three categories of expenses would be considered recurring: Maintenance & Single Point of Failure ("SPOF"); Reconfiguration Install; and IT/Product/HQ. The same presentation represented that recurring CapEx would be approximately 5% of revenue under the new methodology.

73.     Also under the new methodology, six categories of capital expenditures would be considered non-recurring: Initial/Custom Install; Efficiency Improvement; IT/Network Projects; Special Projects; IBX Construction; and Capacity/Product Enhancement.

74.     During its first year operating as a REIT in 2015, Equinix reported a 47% decline in recurring CapEx (from 9.3% of revenue to 4.41%), which, in turn, resulted in a 19% increase to its AFFO. Recurring CapEx as a percentage of revenue continued to steadily decline – by 2023, recurring annual CapEx for just 2.7% of total revenue.

75.     On April 27, 2020, Equinix filed a definitive proxy statement with the SEC (the "2020 Proxy"). The 2020 Proxy explained that in February 2019, Equinix's Compensation Committee

adopted the 2019 annual incentive plan for FY19. Under the plan, Individual Defendants Meyers and Taylor could receive incentive compensation if Equinix met or exceeded certain AFFO/share and revenue targets during FY19. Specifically, the 2020 Proxy stated, in relevant part, that "***100% of our short-term and 60% of our long-term incentives*** (assuming the target award amounts were earned) for our named executive officers were performance-based, dependent on annual revenue ***and adjusted funds from operations per share of Equinix's common stock ("AFFO/Share") growth***. ..."

76.    Throughout the Relevant Period, Equinix's executive compensation plans meant that Defendants Meyers and Taylor could only receive annual bonuses and certain long-term compensation if the Company met certain revenue and AFFO/share metrics.

77.    In total, during the Relevant Period, Defendant Meyers received bonus stock compensation worth more than $106 million. Defendant Taylor received bonus stock compensation worth more than $42 million.

***The Individual Defendants' False and Misleading Statements***

**A. Individual Defendants Cause Equinix's SEC Filings to Falsely Define AFFO**

78.    Throughout the Relevant Period, Individual Defendants caused the Company to issue quarterly and annual SEC filings containing materially false and misleading statements concerning, among other things, how the Company computed AFFO, including how it classified recurring versus non-recurring CapEx, and the importance investors should place on AFFO.

79.    On May 3, 2019, Equinix filed a quarterly report for the first quarter 2019 on Form 10-Q with the SEC (the "1Q19 Form 10-Q").

80.    In a section discussing non-GAAP financial measures, the 1Q19 Form 10-Q[3] stated, in relevant part:

---

[3] Substantially identical statements appeared in the Company's Forms 10-Q for 2Q19, 3Q19, 1Q20, 2Q20, 3Q20, 1Q21, 2Q21, 3Q21, 1Q22, 2Q22, 3Q22, 1Q23, 2Q23, and 3Q23, and annual reports on Forms 10-K for FY19, FY20, FY21, FY22 and FY23.

[W]e believe that evaluating our ongoing operating results may be difficult if limited to reviewing only GAAP financial measures. Accordingly, **we use non- GAAP financial measures to evaluate our operations**.

*          *          *

We have presented such non-GAAP financial measures to provide investors with an additional tool to evaluate our operating results in a manner that **focuses on what management believes to be our core, ongoing business operations**. We believe that the inclusion of these non-GAAP financial measures provides consistency and comparability with past reports and provides a better understanding of the overall performance of the business and ability to perform in subsequent periods. **We believe that if we did not provide such non-GAAP financial information, investors would not have all the necessary data to analyze Equinix effectively**.[4]

81.    With respect to AFFO, the 1Q19 Form 10-Q identified AFFO as one of the Company's two "primary non-GAAP financial measures" and set forth how the figure was purportedly calculated. While the public filings explained that AFFO was reduced by recurring capital expenditures, they did not disclose that the Company was manipulating its CapEx classifications to increase its reported AFFO. Specifically, the 1Q19 Form 10-Q[5] stated, in relevant part:

> **Our primary non-GAAP financial measures**, adjusted EBITDA and **adjusted funds from operations ("AFFO")**, exclude depreciation expense as these charges primarily relate to the initial construction costs of our IBX data centers and do not reflect our current or future cash spending levels to support our business.

*          *          *

> In presenting AFFO, we exclude certain items that we believe are not good indicators of our current or future operating performance. **AFFO represents FFO excluding** depreciation and amortization expense on non-real estate assets, . . . **recurring capital expenditures** and adjustments for unconsolidated joint ventures' and noncontrolling interests' share of these items and net income (loss) from discontinued operations.

82.    Furthermore, the Company's periodic SEC filings falsely defined recurring capital

---

[4] Emphases added unless otherwise indicated.

[5] Substantially identical statements appeared in the Company's Forms 10-Q for 2Q19, 3Q19, 1Q20, 2Q20, 3Q20, 1Q21, 2Q21, 3Q21, 1Q22, 2Q22, 3Q22, 1Q23, 2Q23, 3Q23, and Forms 10-K for FY19, FY20, FY21, FY22 and FY23.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

expenditures as those which extend the life of its data centers or are necessary to support current revenue. In reality, Individual Defendants caused or allowed these types of expenditures to be classified as non-recurring. The 1Q19 Form 10-Q[6] stated, for instance, that Equinix "deduct[s] recurring capital expenditures, which represent expenditures to extend the useful life of its IBX data centers or other assets that are required to support current revenues."

83.    The statements identified above were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, the Individual Defendants failed to disclose: (i) the Company overstated AFFO (and AFFO/share) by improperly classifying recurring CapEx as non-recurring CapEx expenses in violation of its own stated guidelines and SEC rules and regulations; (ii) the improper classification of CapEx materially misled investors into believing that Equinix was meeting, or beating, its AFFO guidance; and (iii) Equinix lacked adequate internal controls. As a result, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times. As a result, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

**B.  Individual Defendants Cause Equinix to Report False and Misleading Quarterly and Annual FY19 Financial Results**

84.    On May 1, 2019, July 31, 2019, October 30, 2019, and February 12, 2020, Equinix announced its quarterly and annual results for 1Q19, 2Q19, 3Q19 and 4Q19/FY19, respectively, accompanied by the filing of its quarterly Form 10-Q and annual Form 10-K (the "FY19 Periodic Filings"). The FY19 Periodic Filings reflected AFFO, AFFO per share, and recurring CapEx as follows:

---

[6] Substantially identical statements appeared in the Company's Forms 10-Q for 2Q19, 3Q19, 1Q20, 2Q20, 3Q20, 1Q21, 2Q21, 3Q21, 1Q22, 2Q22, 3Q22, 1Q23, 2Q23, 3Q23, and Forms 10-K for FY19, FY20, FY21, FY22 and FY23.

| 2019 | AFFO (millions) | AFFO per share | Recurring CapEx (millions) |
|------|-----------------|----------------|----------------------------|
| Q1 | $488 | $5.95 | $21 |
| Q2 | $498 | $5.87 | $37 |
| Q3 | $473 | $5.52 | $47 |
| Q4 | $473 | $5.47 | $81 |
| FY19 | $1,931 | $22.81 | $186 |

85.    Each of the FY19 Periodic Filings attributed the improvement in AFFO to purported factors including "improved operating results" and the "nature" of the business:

Our AFFO results have improved due to the ***improved operating results*** discussed earlier in "Results of Operations," as well as due to the nature of our business model which consists of a recurring revenue stream and a cost structure which has a large base that is fixed in nature as discussed earlier in "Overview."

86.    On July 31, 2019, during an earnings call with analysts and investors, Defendant Taylor stated that the Company was "raising 2019 guidance across the board, including a ***substantial raise in our key AFFO and AFFO per share metrics due to better-than-expected revenue performance and improved operating leverage in the business***."

87.    On October 30, 2019, during an earnings call with analysts and investors, Defendant Taylor stated that the Company's "Q3 adjusted EBITDA was better than expected, ***primarily due to lower maintenance costs***."

88.    On January 7, 2020, Defendant Meyers presented on behalf of the Company at the Citi Global TMT West Conference. During the conference, Defendant Meyers stated that he understood investors were focused on AFFO/share growth, specifically adding: "that's our kind of laser-focus in terms of a guiding light metric."

89.    During an earnings call held on February 12, 2020, Defendant Meyers stated, in relevant part:

We feel like it's our job to maximize long-term value creation . . . driving our own digital transformation are all things that are going to help us sustain ***AFFO per share growth. And frankly, that's our lighthouse metric***, and we feel like it would be irresponsible not to invest behind the momentum that we have right now.

90.     The statements identified above in earnings conference calls and the FY19 Periodic Filings were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, the Individual Defendants failed to disclose: (i) the Company overstated AFFO (and AFFO/share) by improperly classifying recurring CapEx as non-recurring CapEx expenses in violation of its own stated guidelines and SEC rules and regulations; (ii) the improper classification of CapEx materially misled investors into believing that Equinix was meeting, or beating, its AFFO guidance; and (iii) Equinix lacked adequate internal controls. As a result, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times. As a result, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

## C. Individual Defendants Cause Equinix to Report False and Misleading Quarterly and Annual FY20 Financial Results

91.     On May 6, 2020, July 29, 2020, October 28, 2020, and February 10, 2021, Equinix announced its quarterly and annual results for 1Q20, 2Q20, 3Q20 and 4Q20/FY20, respectively, accompanied by the filing of its quarterly Form 10-Q and annual Form 10-K (the "FY20 Periodic Filings"). The FY20 Periodic Filings reflected AFFO, AFFO per share, and recurring CapEx as follows:

| 2020 | AFFO (millions) | AFFO per share | Recurring CapEx (millions) |
|------|------|------|------|
| Q1 | $535 | $6.21 | $18 |
| Q2 | $558 | $6.35 | $30 |
| Q3 | $580 | $6.48 | $38 |
| Q4 | $516 | $5.76 | $74 |
| FY20 | $2,189 | $24.76 | $160 |

92.     Each of the FY20 Periodic Filings attributed the improvement in AFFO to "improved operating results" discussed elsewhere in the filing and the "nature" of the business:

Our AFFO results have improved due to the ***improved operating results*** discussed

earlier in "Results of Operations," as well as due to the **nature of our business model** which consists of a recurring revenue stream and a cost structure which has a large base that is fixed in nature as discussed earlier in "Overview."

93.    On March 2, 2020, Defendant Taylor presented on behalf of the Company at the Morgan Stanley Technology, Media & Telecom Conference. Defendant Taylor highlighted to investors Equinix's outlier status as it generated more AFFO/share then the "next 6" public companies combined:

> Going back to my comment in AFFO, we threw up an AFFO per share, so it sort of levels the playing field with all the different capital structures. And we had – **we deliver more AFFO per share than the next 6 combined, public companies combined**.

94.    On May 6, 2020, Equinix hosted an earnings conference call to discuss 1Q20 financial results. During the call, Defendant Taylor stressed that AFFO of $535 million was "above our expectations on a constant currency basis **due to strong operating performance and lower-than-planned interest expense and income taxes**." When asked specifically about the "variability in maintenance CapEx[,]" Defendant Taylor responded:

> Sure. Yes. We did see slightly less this quarter than we anticipated, roughly 1.2%. If I go to the same quarter last year, it was 1.5% of revenues. I mean certainly, as we're all aware during the latter part of the quarter, **things started to slow down a little bit. We also were putting our IBXs into a more restricted fashion**. No surprise as things took root in different parts of the world. But all that said, when you look at our overall guidance, we're still looking at somewhere around $150 million to $160 million of capital that will go into recurring and only a portion of that, of course, is maintenance, **roughly 2% of our recurring CapEx is maintenance**. And so you'll see it go back to a more traditional level in Q2. That's reflected in the guidance. And then for the year, you'll see it. Roughly – a little bit lower than we saw last year, but roughly in line with what our expectations would be on a go-forward basis.

95.    On May 27, 2020, Defendant Meyers presented on behalf of the Company at the RBC Capital Markets Data Center & Connectivity Conference. During the conference, Defendant Meyers engaged in the following question-and-answer discussion with an analyst:

> *Analyst*: [D]uring COVID, one naturally has to make trade-offs about what to do operationally with respect to maintenance CapEx, maintenance OpEx.

. . . . Has there been any of that kind of give and take at Equinix? And might we revert to kind of higher more normalized levels of maintenance CapEx once they come out the other side of the pandemic?

*Defendant Meyers*: Yes. Generally, I wouldn't say that that was really a factor for us in terms of affecting our maintenance costs and maintenance CapEx. Because, again, all of our sites remain fully staffed and operational. . . . I'm sure there were examples of maintenances that were pushed out or -- but not in any meaningful way. ***And Q1 was low for us, but I think it was more an artifact of one pull forward into Q4***, which is a common thing for us to do at the end of the year is to try to get those things pulled in if we can get them done in Q4 ***and then probably a little bit of things pushing out into Q2***.

But I think we're, for the most part, going to trend towards our more common levels of recurring CapEx, which 3% to 5% annually. But Q1 is a seasonally low. It was 1.2%. I think that's probably at very low end. We'd expect a more normal level in Q2, which is more at the 3% level.

96.    On February 10, 2021, the Company hosted an earnings call with analysts and investors to discuss 4Q20 financial results. During the call, Defendant Taylor reported Q4 AFFO of $517 million, adding that the result was "meaningfully above our expectations on a constant currency basis due to strong operating performance ***while absorbing seasonally higher recurring CapEx investments***, a similar scenario to prior years."

97.    The statements identified above in earnings conference calls and the FY20 Periodic Filings were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, the Individual Defendants failed to disclose: (i) the Company overstated AFFO (and AFFO/share) by improperly classifying recurring CapEx as non-recurring CapEx expenses in violation of its own stated guidelines and SEC rules and regulations; (ii) the improper classification of CapEx materially misled investors into believing that Equinix was meeting, or beating, its AFFO guidance; and (iii) Equinix lacked adequate internal controls. As a result, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times. As a result, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

**D. Individual Defendants Cause Equinix to Report False and Misleading Quarterly and Annual FY21 Financial Results**

98.    On April 28, 2021, July 28, 2021, November 3, 2021, and February 16, 2022, Equinix announced its quarterly and annual results for 1Q21, 2Q21, 3Q21 and 4Q21/FY21, respectively, accompanied by the filing of its quarterly Form 10-Q and annual Form 10-K (the "FY21 Periodic Filings"). The FY21 Periodic Filings reflected AFFO, AFFO per share, and recurring CapEx as follows:

| 2021 | AFFO (millions) | AFFO per share | Recurring CapEx (millions) |
|---|---|---|---|
| Q1 | $627 | $6.98 | $20 |
| Q2 | $632 | $7.01 | $45 |
| Q3 | $628 | $6.94 | $48 |
| Q4 | $564 | $6.22 | $86 |
| FY20 | $2,451 | $27.11 | $199 |

99.    Each of the FY21 Periodic Filings attributed the improvement in AFFO to "improved operating results" discussed elsewhere in the filing and the "nature" of the business:

> Our AFFO results have improved *due to the improved operating results* discussed earlier in "Results of Operations," as well as due to the *nature of our business model* which consists of a recurring revenue stream and a cost structure which has a large base that is fixed in nature as discussed earlier in "Overview."

100.    On March 10, 2021, Equinix's Chief Customer & Revenue Officer, Karl Strohmeyer ("Strohmeyer"), presented on behalf of the Company at the Deutsche Bank Virtual Media Internet and Telecom Conference. During the conference, Strohmeyer described revenue and AFFO per share growth as the "things that obviously investors really care about[.]"

101.    On April 28, 2021, the Company hosted an earnings conference call to discuss 1Q21 financial results. During the call, Defendant Taylor reported Q1 AFFO as $627 million, adding that it was "meaningfully above our expectations *due to strong operating performance and lower seasonal recurring capital expenditures*."

102.    On July 28, 2021, Equinix hosted an earning conference call to discuss 2Q21 financial results. During the call, Defendant Taylor reported that Q2 AFFO was "$632 million, including a $25 million recurring CapEx increase compared to the prior quarter, ***above our expectations due to strong operating performance and lower integration costs***."

103.    On January 5, 2022, Defendant Meyers presented at the Citi AppsEconomy Conference on behalf of the Company. During the conference, Defendant Meyers discussed AFFO per share growth, stating in relevant part:

> Well, I mean, to some degree, that's clearly the way we think about it, right, which is, hey, what do we need to do in terms of delivering margin expansion because ***in the end, we have to deliver the AFFO per share growth, right?*** And so – and because we serve – aren't going to get that below the line, then what we have to do is get good solid growth, and then we have to flow that through. And if we want to perform on the AFFO per share line, we have to continue to drive some level of operating leverage in the business.

104.    During a Company earnings call held February 16, 2022 to discuss 4Q21 and FY21 financial results, Defendant Taylor was asked what was driving years of the Company's CapEx being at the low end of its forecasted range. In response, Defendant Taylor stated:

> And so just the recurring CapEx, we are at . . . sort of the lower end of the range for fiscal year '22, ***quite just timing***, Nick. . . . And so you saw an elevated Q4 number at roughly 5% recurring CapEx relative to revenue. It steps down, of course, in Q1. And then as we look through the year, it is roughly somewhere between 2% and 3%. ***But I think the biggest thing is really about timing*** and a number of new assets that we're bringing into the portfolio. And as a result, when you think about the level of recurring CapEx that has to be made, the newer the portfolio, the better the position you have on recurring CapEx.

105.    The statements identified above during earnings conference calls, public presentations, and in the FY21 Periodic Filings were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, the Individual Defendants failed to disclose: (i) the Company overstated AFFO (and AFFO/share) by improperly classifying recurring CapEx as non-recurring CapEx expenses in violation of its own stated guidelines and SEC rules and regulations; (ii) the improper classification

of CapEx materially misled investors into believing that Equinix was meeting, or beating, its AFFO guidance; and (iii) Equinix lacked adequate internal controls. As a result, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times. As a result, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

**E.    Individual Defendants Cause Equinix to Report False and Misleading Quarterly and Annual FY22 Financial Results**

106.    On April 27, 2022, July 27, 2022, November 2, 2022, and February 15, 2023, Equinix announced its quarterly and annual results for 1Q22, 2Q22, 3Q22 and 4Q22/FY22, respectively, accompanied by the filing of its quarterly Form 10-Qs and annual Form 10-K (the "FY22 Periodic Filings"). The FY22 Periodic Filings reflected AFFO, AFFO per share, and recurring CapEx as follows:

| 2022 | AFFO (millions) | AFFO per share | Recurring CapEx (millions) |
|------|-----------------|----------------|----------------------------|
| Q1 | $653 | $7.16 | $24 |
| Q2 | $691 | $7.58 | $35 |
| Q3 | $712 | $7.73 | $50 |
| Q4 | $658 | $7.09 | $809 |
| FY20 | $2,714 | $29.55 | $189 |

107.    Each of the FY22 Periodic Filings attributed the improvement in AFFO to "improved operating results" discussed elsewhere in the filing and the "nature" of the business:

> Our AFFO results have improved due to the ***improved operating results*** discussed earlier in "Results of Operations," as well as due to the ***nature of our business model*** which consists of a recurring revenue stream and a cost structure which has a large base that is fixed in nature as discussed earlier in "Overview."

108.    On April 27, 2022, the Company hosted an earnings call with analysts and investors to discuss 1Q22 financial results. During the call, Defendant Meyers assured investors that Equinix would meet its AFFO guidance through top line growth and operating leverage, stating, in part: "And

at the end of the day, that's really our lighthouse metric is driving that AFFO per share growth."

109.   On May 23, 2022, Defendant Meyers appeared on behalf of the Company at the JPMorgan Global Technology, Media & Communications Conference. During the conference, Defendant Meyers stated that the Company's focus "is on long-term value creation, and *that primarily is in the form of AFFO per share growth*. And so that's really our lighthouse metric."

110.   On September 23, 2022, Barclays issued a report titled "Mounting Risks: Downgrading EQIX to Equal Weight. . . ." (the "Barclays Report"). The Barclays Report reasoned that Equinix was likely overstating AFFO, noting that the Company's recurring CapEx averaged 8.7% of revenue before the transition to a REIT, but dropped to just 3.6% of revenue afterward. Specifically, the Barclays Report stated, in relevant part:

> Investor attention has recently focused on earnings quality, and specifically how maintenance and and [sic] growth capex are allocated. *As AFFO is a non-GAAP number, our sense is management teams have a fair amount of discretion in how the spending is characterized*. This is particularly relevant because REITs deduct maintenance capex from FFO when calculating AFFO, but not growth capex. (EQIX specifically uses the labels "recurring vs. non-recurring" capex, instead of "maintenance vs. growth" but we see no material difference in the definitions). In the three years prior to becoming a REIT (2012-2014), EQIX's recurring capex averaged 8.7% of revenue (during this period EQIX used the term "ongoing" capex, but again no material difference in definition). Since 2015 when the company filed as a REIT, recurring capex as averaged 3.6%.

111.   The Barclays Report also reasoned that there was no "plausible reason" for Equinix's change in the methodology for classifying CapEx after 2014, other than to inflate AFFO, stating in relevant part:

> We acknowledge the capex growth and CabE CAGR comparison is complicated by the net purchase of assets since 2014, but that would also increase the cabinet total, all else equal. Management suggests it is expensing ~3% of revenue on maintenance, in addition to the ~3% of revenue accounted for as maintenance capex in AFFO. *Still, we do not see a plausible reason why capex accounting changed after 2014, other than to reflect higher AFFO*. . . .

112.   On this news, Equinix's stock price declined by approximately 2.6%, from $609.26 on September 22, 2022, to $593.13 on September 23, 2022.

113.    On November 2, 2022, Equinix hosted an earnings conference call to discuss 3Q22 financial results. During the call, Defendant Meyers reported that adjusted EBITDA was up 11% year-over-year, with "***AFFO meaningfully ahead of our expectations due to strong operating performance***."

114.    On January 4, 2023, Defendant Meyers appeared at the Citi Communications, Media & Entertainment Conference on behalf of the Company. During the conference, Defendant Meyers stated, in relevant part:

> I will say this in terms of giving you a little more concrete answer on that, ***we clearly see operating leverage as one fundamental element of driving AFFO per share growth, which we view as the lighthouse metric for our business***. Because at the end, I think investors see it and say, "Look, what do I get in terms of dividend yield and what are you going to give me on AFFO per share", right? And so that's fundamentally our people. ***And we very – we have that very deeply ingrained into our thinking about how we run the business***.

115.    The statements identified above during earnings conference calls, public presentations, and in the FY22 Periodic Filings were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, the Individual Defendants failed to disclose: (i) the Company overstated AFFO (and AFFO/share) by improperly classifying recurring CapEx as non-recurring CapEx expenses in violation of its own stated guidelines and SEC rules and regulations; (ii) the improper classification of CapEx materially misled investors into believing that Equinix was meeting, or beating, its AFFO guidance; and (iii) Equinix lacked adequate internal controls. As a result, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times. As a result, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

**F.    Individual Defendants Cause Equinix to Report False and Misleading Quarterly and Annual FY23 Financial Results**

116.    On May 3, 2023, August 2, 2023, October 25, 2023, and February 14, 2024, Equinix

29

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

announced its quarterly and annual results for 1Q23, 2Q23, 3Q23 and 4Q23/FY23, respectively, accompanied by the filing of its quarterly Form 10-Qs and annual Form 10-K (the "FY23 Periodic Filings"). The FY23 Periodic Filings reflected AFFO, AFFO per share, and recurring CapEx as follows:

| 2023 | AFFO (millions) | AFFO per share | Recurring CapEx (millions) |
|------|------|------|------|
| Q1 | $802 | $8.59 | $22 |
| Q2 | $754 | $8.04 | $40 |
| Q3 | $772 | $8.19 | $52 |
| Q4 | $691 | $7.30 | $105 |
| FY20 | $3,019 | $32.11 | $219 |

117.     Each of the FY23 Periodic Filings attributed the improvement in AFFO to "improved operating results" discussed elsewhere in the filing and the "nature" of the business:

> Our AFFO results have improved due to the ***improved operating results*** discussed earlier in "Results of Operations," as well as due to the ***nature of our business model*** which consists of a recurring revenue stream and a cost structure which has a large base that is fixed in nature as discussed earlier in "Overview."

118.     On March 6, 2023, Defendant Meyers appeared on behalf of the Company at the Citi Miami Global Property CEO Conference. Defendant Meyers stated that the "***lighthouse metric for us is AFFO per share***. That combined with dividend yield is what we think is the value creation engine for investors. ***And so that's what we're really focused on***."

119.     On May 2, 2023, Equinix hosted an earnings conference call to discuss 1Q23 financial results. During the call, Defendant Taylor reported that Q1 AFFO was $802 million, "above our expectations ***due to strong business performance***, including lower net interest expense and income taxes."

120.     On August 2, 2023, the Company hosted an earnings conference call to discuss 2Q23 financial results. During the call, Defendant Taylor reported "Global Q2 AFFO was $754 million, above our expectation due to strong business performance and lower net interest expense." In

response to an analyst's question asking whether there was "anything notable to be aware" with regards to the Company's higher recurring CapEx guidance, Defendant Taylor stated, in relevant part:

> *As it relates -- no, there's a little bit more recurring CapEx. When we have capacity and we look across the portfolio and think what can we do based on the capacities we have*. And so sometimes when we work with Rob Abdel's organization said, we have capacity to put a little bit more recurring CapEx into the year. And so what you could do is pull it forward from 1 year and put it into the year prior. And so that's what you've just seen. We have -- *we felt we had a little bit more capacity to invest in some recurring CapEx this year*. That really takes away that obligation for next year.

121.    On October 25, 2023, Equinix held its 3Q23 earnings conference call, during which Defendant Taylor reported that "Global Q3 AFFO was $772 million, *above our expectations due to strong business performance and timing of recurring CapEx spend*."

122.    On December 6, 2023, the Company's Chief Accounting Officer, Simon Miller ("Miller") appeared on behalf of Equinix the Barclays Global Technology Conference. Asked about the distinction between recurring and non-recurring CapEx, Miller partially revealed the truth of the Company's CapEx classification scheme, admitting that Equinix placed significant pressure on its design teams so that the Company could categorize spending as non-recurring CapEx. In relevant part, Miller stated:

> [W]e've got some facilities that are well over 20 years old. This is actually something that's been on our mind for a few years now. *Generally, when we go in and do a big maintenance project, we put a lot of pressure on our design and construction teams to release capacity. Where we are able to release capacity and live up to this standard of how we define AFFO in our earnings release, if we create capacity for incremental revenue, not just [maintain] revenue, we push that into expansion CapEx*. And that takes the shape of replacing CRAC units so that you can provide more air flow to the white space and therefore distribute more power, so you can take cabs off of engineering (inaudible).
>
> So I may be [able] . . . after 1 maintenance project, release 300 cabs in data center. Well, that's 300 cabs of incremental revenue. And I'm actually going to get a return on it. *So we'll put that into expansion*. Where we don't have that opportunity, it's just traditional recurring CapEx. And we've got a, as you mentioned, we've got some big ones coming up, *putting a ton of pressure on the team to just rethink how we might engage in replacing some of the bigger parts of that infrastructure*, definitely around

air movers, CRAC [computer room air conditioner] units, in some cases power distribution.

123.    Miller further stated that Equinix's design and construction team was coming up with "very creative ways" to keep data centers "up and live and relevant" and "actually improve, on the efficiency side[.]..." Miller further elaborated that Equinix labeled certain projects a "refresh" that could be considered "maintenance," stating, in relevant part: "I really didn't dream 2 years ago when we were kind of looking at this probably 5-year to 7-year period of, I'd call it – *we call it a refresh, but maintenance is probably a good word for it*."

124.    On February 14, 2024, during an earnings conference call, Defendant Meyers explained that "the benefits of efficiency investments over the past few years" allowed the Company to, among other things, "expand margins and deliver outsized performance on AFFO per share, which we continue to see as our lighthouse metric and the bedrock of long-term value creation." During the same call, Defendant Taylor reported that Q4 AFFO was "$691 million, *above our expectations due to strong business performance and favorable interest income*, offset in part by higher seasonal recurring CapEx."

125.    The statements identified above during earnings conference calls, public presentations, and in the FY22 Periodic Filings were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, the Individual Defendants failed to disclose: (i) the Company overstated AFFO (and AFFO/share) by improperly classifying recurring CapEx as non-recurring CapEx expenses in violation of its own stated guidelines and SEC rules and regulations; (ii) the improper classification of CapEx materially misled investors into believing that Equinix was meeting, or beating, its AFFO guidance; and (iii) Equinix lacked adequate internal controls. As a result, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times. As a result, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

**G. Individual Defendants Cause Equinix to Issue False and Misleading Proxy Statements During the Relevant Period**

126.    On April 27, 2020, Equinix filed the 2020 Proxy with the SEC, wherein Defendants solicited shareholder votes – in advance of an annual stockholder meeting to be held on June 18, 2020 – in favor of numerous proposals, including the election or re-election of ten individuals to the Company's Board, including Defendants Caldwell, Fox-Martin, Hromadko, Meyers, Paisley, Rivera, and Van Camp.

127.    The 2020 Proxy stated that Equinix had adopted the Code of Conduct, applicable to all officers, directors and employees.

128.    With respect to "Board Risk Oversight," the 2020 Proxy stated:

Our Board's oversight of risk management is designed to support the achievement of organizational objectives, including strategic objectives, to improve Equinix's long-term organizational performance and to enhance stockholder value. The involvement of the full Board in setting Equinix's business strategy is a key part of its assessment of what risks Equinix faces, what steps management is taking to manage those risks, and what constitutes an appropriate level of risk for Equinix. Our senior management attends the quarterly Board meetings, presents to the Board on strategic and other matters, and is available to address any questions or concerns raised about risk-management-related issues, or any other matters. Board members also have ongoing and direct access to senior management between regularly scheduled board meetings for any information requests or issues they would like to discuss. In addition, in Sept. 2019 the Board held a strategy meeting with senior management to discuss strategies, key challenges, and risks and opportunities for Equinix. The Board typically holds a meeting focused solely on strategy annually, to set the stage for the planning and development of Equinix's operating plan for the coming year.

Equinix has completed a global risk assessment to identify key strategic, operational, financial and regulatory compliance risks and will continue to evaluate such risks. These risks have been communicated to and assessed by Equinix's executive management, the Governance Committee and the full Board. The Board received an enterprise risk briefing in Sept. 2019 in connection with its strategy meeting and is scheduled to receive its next enterprise risk briefing in Sept. 2020. Additionally, in 2019 the full Board received a briefing on cybersecurity. Briefings on cybersecurity, as well as other enterprise risks, will also be provided in 2020.

129.    The 2020 Proxy stated the following with respect to AFFO, in relevant part:

Equinix uses Funds from Operations ("FFO") and Adjusted Funds from Operations

("AFFO"), which are non-GAAP financial measures commonly used in the REIT industry. FFO is calculated in accordance with the standards established by the National Association of Real Estate Investment Trusts. FFO represents net income (loss), excluding gain (loss) from the disposition of real estate assets, depreciation and amortization on real estate assets and adjustments for unconsolidated joint ventures' and non-controlling interests' share of these items. In presenting AFFO, Equinix excludes certain items that we believe are not good indicators of our current or future operating performance. AFFO represents FFO excluding depreciation and amortization expense on non-real estate assets, accretion, stock-based compensation, restructuring charges, impairment charges, transaction costs, an installation revenue adjustment, a straight-line rent expense adjustment, a contract cost adjustment, amortization of deferred financing costs and debt discounts and premiums, gain (loss) on debt extinguishment, an income tax expense adjustment, recurring capital expenditures, net income (loss) from discontinued operations, net of tax, and adjustments from FFO to AFFO for unconsolidated joint ventures' and noncontrolling interests' share of these items.

130.    The 2020 Proxy failed to disclose, however: (i) that the Company overstated AFFO (and AFFO/share) by improperly classifying recurring CapEx as non-recurring CapEx expenses in violation of its own stated guidelines and SEC rules and regulations; (ii) the improper classification of CapEx materially misled investors into believing that Equinix was meeting, or beating, its AFFO guidance; and (iii) Equinix lacked adequate internal controls. As a result, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

131.    Additionally, the 2020 Proxy failed to disclose that: (i) the Individual Defendants violated the Company's Code of Conduct, either without waivers or without such waivers being disclosed; and (ii) the Board and its committees were not adequately exercising their risk oversight functions and were causing or permitting the Company to issue false and misleading statements.

132.    The 2020 Proxy further failed to disclose that the Company was beset with compliance problems that posed significant risks of harm, and that the Board lacked a system to oversee mission-critical compliance risks related to compliance and financial reporting.

133.    The false and misleading elements of the 2020 Proxy were material to stockholders in voting on the Board's proposals, particularly with respect to stockholders' consideration of the election and reelection of certain directors.

134.    On April 13, 2021, Equinix filed a definitive proxy statement with the SEC (the "2021

Proxy") wherein Defendants solicited in favor of numerous proposals, including the election or re-election of nine individuals to the Company's Board, including Defendants Caldwell, Fox-Martin, Hromadko, Meyers, Paisley, Rivera, and Van Camp.

135.    The 2021 Proxy contained substantially similar statements regarding the Company's Code of Conduct, the Board's role in oversight of risk management, and AFFO as the 2020 Proxy detailed above.

136.    The 2021 Proxy failed to disclose, however: (i) that the Company overstated AFFO (and AFFO/share) by improperly classifying recurring CapEx as non-recurring CapEx expenses in violation of its own stated guidelines and SEC rules and regulations; (ii) the improper classification of CapEx materially misled investors into believing that Equinix was meeting, or beating, its AFFO guidance; and (iii) Equinix lacked adequate internal controls. As a result, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

137.    Additionally, the 2021 Proxy failed to disclose that: (i) the Individual Defendants violated the Company's Code of Conduct, either without waivers or without such waivers being disclosed; and (ii) the Board and its committees were not adequately exercising their risk oversight functions and were causing or permitting the Company to issue false and misleading statements.

138.    The 2021 Proxy further failed to disclose that the Company was beset with compliance problems that posed significant risks of harm, and that the Board lacked a system to oversee mission-critical compliance risks related to compliance and financial reporting.

139.    The false and misleading elements of the 2021 Proxy were material to stockholders in voting on the Board's proposals, particularly with respect to stockholders' consideration of the election and reelection of certain directors.

140.    On April 12, 2022, Equinix filed a definitive proxy statement with the SEC (the "2022 Proxy") wherein Defendants solicited in favor of numerous proposals, including the election or re-election of nine individuals to the Company's Board, including Defendants Caldwell, Fox-Martin, Hromadko, Meyers, Paisley, Rivera, and Van Camp.

141.    The 2022 Proxy contained substantially similar statements regarding the Company's

Code of Conduct, the Board's role in oversight of risk management, and AFFO as the 2020 Proxy and 2021 Proxy detailed above.

142.    The 2022 Proxy failed to disclose, however: (i) that the Company overstated AFFO (and AFFO/share) by improperly classifying recurring CapEx as non-recurring CapEx expenses in violation of its own stated guidelines and SEC rules and regulations; (ii) the improper classification of CapEx materially misled investors into believing that Equinix was meeting, or beating, its AFFO guidance; and (iii) Equinix lacked adequate internal controls. As a result, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

143.    Additionally, the 2022 Proxy failed to disclose that: (i) the Individual Defendants violated the Company's Code of Conduct, either without waivers or without such waivers being disclosed; and (ii) the Board and its committees were not adequately exercising their risk oversight functions and were causing or permitting the Company to issue false and misleading statements.

144.    The 2022 Proxy further failed to disclose that the Company was beset with compliance problems that posed significant risks of harm, and that the Board lacked a system to oversee mission-critical compliance risks related to compliance and financial reporting.

145.    The false and misleading elements of the 2022 Proxy were material to stockholders in voting on the Board's proposals, particularly with respect to stockholders' consideration of the election and reelection of certain directors.

146.    On April 12, 2023, Equinix filed a definitive proxy statement with the SEC (the "2023 Proxy") wherein Defendants solicited in favor of numerous proposals, including the election or re-election of eleven individuals to the Company's Board, including Defendants Caldwell, Fox-Martin, Hromadko, Meyers, Olinger, Paisley, Patel, Rivera, Russo and Van Camp.

147.    The 2023 Proxy contained substantially similar statements regarding the Company's Code of Conduct, the Board's role in oversight of risk management, and AFFO as the 2020 Proxy, 2021 Proxy, and 2022 Proxy detailed above.

148.    The 2023 Proxy failed to disclose, however: (i) that the Company overstated AFFO (and AFFO/share) by improperly classifying recurring CapEx as non-recurring CapEx expenses in

violation of its own stated guidelines and SEC rules and regulations; (ii) the improper classification of CapEx materially misled investors into believing that Equinix was meeting, or beating, its AFFO guidance; and (iii) Equinix lacked adequate internal controls. As a result, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

149.    Additionally, the 2023 Proxy failed to disclose that: (i) the Individual Defendants violated the Company's Code of Conduct, either without waivers or without such waivers being disclosed; and (ii) the Board and its committees were not adequately exercising their risk oversight functions and were causing or permitting the Company to issue false and misleading statements.

150.    The 2023 Proxy further failed to disclose that the Company was beset with compliance problems that posed significant risks of harm, and that the Board lacked a system to oversee mission-critical compliance risks related to compliance and financial reporting.

151.    The false and misleading elements of the 2023 Proxy were material to stockholders in voting on the Board's proposals, particularly with respect to stockholders' consideration of the election and reelection of certain directors.

***The Truth Begins to Emerge, as Materially False and Misleading Statements Continue***

152.    On March 20, 2024, the Hindenburg Report was published. The Hindenburg Report purported to be based upon an investigation that "involved interviewing 37 former Equinix employees, industry experts and competitors, along with reviewing financial statements and litigation records." The Hindenburg Report determined that the Company's financial results were the product of deliberate accounting manipulations, specifically as it related to the reporting of CapEx and the impact on AFFO.

153.    The Hindenburg Report concluded that Equinix manipulates AFFO by improperly categorizing maintenance costs as spending on growth. According to the Hindenburg Report, this accounting manipulation resulted in overstating AFFO by an estimated 19% in 2015 and by at least 22% in 2023.

154.    The Hindenburg Report described pressure from "top management" to push expenditures into non-recurring CapEx to boost reported AFFO. According to former employees

cited in the Hindenburg Report:

> The tone from the top also became evident when speaking with numerous former employees. ***Even as they detailed accounting games that outsiders would likely view as flagrant manipulation***, many described these examples as though they were nothing more than a creative and dutiful execution of their responsibilities placed on them by management to boost reported AFFO by almost any means necessary.

155. The Hindenburg Report reported that, for instance, Equinix improperly characterized battery replacements as growth CapEx instead of maintenance CapEx. Equinix would classify otherwise routine battery replacements as growth CapEx by characterizing this activity as replacing a "battery system". One former executive is quoted in the Hindenburg Report as stating that "[a]ll you do is replace the batteries within the cabinets. And that's considered the system."

156. On this news, the price of Equinix common stock declined from a close of $844.58 on March 19, 2024, to a close of $824.88 on March 20, 2024.

***Post-Relevant Period Developments***

157. On March 25, 2024, Equinix made its first public comments in response to the Hindenburg Report, issuing a press release announcing that the Company's Audit Committee would commence an independent investigation into the findings of the Hindenburg Report and that the Company had received a subpoena from the U.S. Attorney's office for the Northern District of California.

158. On May 8, 2024, the Company issued a press release announcing its 1Q24 financial results. While the Company claimed that its Audit Committee investigation found no accounting errors, it also revealed that on April 30, 2024, Equinix received a subpoena from the SEC.

159. On May 9, 2024, Equinix announced during its 1Q24 earnings conference call that the Company was changing its methodology for classifying capital expenditures by adding a new category of non-recurring CapEx called "Redevelopment CapEx" that would apply to refurbishing data centers over 20 years-old:

> Now, we're also entering a stage in our asset lifecycle where we're evaluating select opportunities to invest in highly valued IBXs that have been operating for 20 years or

longer. ***Starting this quarter, we added a new category of non-recurring capex spend to our disclosures, referred to as redevelopment capex, to track these investments to enhance the capacity, efficiency and operating standards of facilities in this category, and to attract capital investments that are intended to meaningfully extend the economic life of assets***. Our first redevelopment project is DC2, one of our original IBXs that opened in the early 2000s, and home to our networking ecosystem in northern Virginia. Total estimated spend on this DC2 project will approximate $76 million broken into two primary categories of capex investment, redevelopment and recurring. We expect the $56 million redevelopment portion of the investment to yield meaningful additional space and power capacity, and, given the favorable pricing environment and high customer demand for the DC2 asset, we anticipate that this capacity will generate additional revenues and cash flow that should result in an IR well above our current stabilized asset yields. The remaining portion of the investment, which relates to maintaining our existing revenues, such as roof replacement, will be categorized as typical as recurring capex.

160.    On January 6, 2025, United States District Judge Vince Chhabria denied in part and granted in part the Securities Class Action defendants' motion to dismiss the amended complaint. Securities Class Action, ECF No. 67. The Court found that the amended complaint "raises a strong inference that Equinix misclassified routine recurring capital purchases—like chillers, batteries, and lightbulbs—as non-recurring to artificially inflate its AFFO numbers in a way that misled investors." *Id*. at 8. The Court further held that the Securities Class Action complaint had "created a strong inference of scienter." *Id*. at 10. The complaint contained "particularized allegations that Meyers and Taylor had 'actual access to the disputed information' because they repeatedly discussed capital expenditures and commented on the reasons why AFFO was high and recurring capital expenditures were low." *Id*. at 9.

***Harm to the Company***

161.    As a direct and proximate result of the Individual Defendants' misconduct, Equinix has lost and expended, and will lose and expend, millions of dollars.

162.    Such expenditures include, but are not limited to, the legal fees associated with the Securities Class Action filed against the Company and Defendants Meyers and Taylor, and amounts paid to outside lawyers, accountants, and investigators in connection therewith.

163.    Such expenditures also include, but are not limited to, significant compensation and

benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

164.    Furthermore, the Securities Class Action has exposed the Company to massive class-wide liability.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

165.    Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breach of fiduciary duties by the Individual Defendants.

166.    Equinix is named solely as a nominal party in this action.  This is not a collusive action to confer jurisdiction on this Court that it would otherwise not have.

167.    Plaintiff is a current shareholder of Equinix and was a continuous shareholder of the Company during the period of the Individual Defendants' wrongdoing alleged herein. Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and retained counsel competent and experienced in derivative litigation.

168.    A pre-suit demand on the Board of Equinix is futile and, therefore, excused. At the time this action was commenced, the ten-member Board was comprised of Defendants Meyers, Fox-Martin, Caldwell, Hromadko, Olinger, Paisley, Patel, Rivera, Russo, and Van Camp (the "Director Defendants"). Accordingly, Plaintiff is only required to show that five Directors cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action. As set forth below, all of the Board's current members are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action, including because they face a substantial likelihood of liability, and so demand on the Board to institute this action is not necessary because such a demand would have been a futile act.

169.    The Director Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

170.    Each of the Director Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's

stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

171.    Moreover, the Director Defendants willfully ignored, or recklessly failed to inform themselves of, the obvious problems with the Company's internal controls, practices, and procedures and failed to make a good faith effort to correct the problems or prevent their recurrence.

172.    Defendant Fox-Martin serves as the Company's President and CEO, is not disinterested or independent, and is therefore incapable of considering a demand. Thus, the Company admits that Defendant Fox-Martin is a non-independent director.

173.    Defendant Meyers is not disinterested or independent because he is named as a defendant, and faces significant personal liability, in the Securities Class Action based on substantially the same wrongdoing as alleged herein, specifically issuing materially false and misleading statements during the Relevant Period.

174.    As set forth in the 2024 Proxy, the Company admits that Defendants Meyers and Van Camp are not independent directors. Defendants Meyers and Van Camp, therefore, are not disinterested or independent and are therefore incapable of considering a demand.

175.    Defendants Paisley, Olinger, and Russo serve or served on the Company's Audit Committee during the Relevant Period (the "Audit Defendants") and, pursuant to the Audit Committee Charter, were specifically charged with the responsibility to assist the Board in fulfilling its oversight responsibilities related to, *inter alia*, financial accounting and reporting, the underlying internal controls and procedures over financial reporting, and the audits of the financial statements. At all relevant times, however, the Audit Defendants breached their fiduciary duty to the Company by failing to prevent, correct, or inform the Board of the issuance of material misstatements and omissions regarding the Company's business and the adequacy of its internal controls as alleged above. Therefore, the Audit Defendants cannot independently consider any demand to sue themselves for breaching their fiduciary duties to the Company, as that would expose them to substantial liability and threaten their livelihoods.

176.    The Director Defendants, as members of the Board, were and are subject to the

Company's Code of Conduct. The Code of Conduct goes well beyond the basic fiduciary duties required by applicable laws, rules, and regulations, requiring the Directors to also adhere to the Company's standards of business conduct. The Director Defendants violated the Code of Conduct because they knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. Because the Director Defendants violated the Code of Conduct, they face a substantial likelihood of liability for breaching their fiduciary duties, and therefore demand upon them is futile.

177.    All of the Board's current members derive substantial revenue from the Company, control the Company, and are indebted to each other. These conflicts of interest have precluded the Board's current members from calling into question the Director Defendants' conduct.

178.    Moreover, none of the Director Defendants have taken remedial action to redress the conduct alleged herein.

179.    The Director Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the directors can claim exculpation from their violations of duty pursuant to the Company's charter. As a majority of the directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein. They cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

180.    The acts complained of herein constitute violations of fiduciary duties owed by Equinix's officers and directors, and these acts are incapable of ratification.

181.    Thus, for all of the reasons set forth above, all of Equinix's current directors are unable to consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1

**COUNT I**

2

**Against the Individual Defendants for Violations of § 14(a)**
**of the Exchange Act, 15 U.S.C. § 78n(a) and Rule 14a-9 (17 C.F.R. § 240.14a-9)**

3

4

182.    Plaintiff incorporates by reference and realleges each and every allegation contained

5

above, as though fully set forth herein.

6

183.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be

7

unlawful for any person, by use of the mails or by any means or instrumentality of interstate

8

commerce or of any facility of a national securities exchange or otherwise, in contravention of such

9

rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest

10

or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or

11

consent or authorization in respect of any security (other than an exempted security) registered

12

pursuant to section 12 of this title [15 U.S.C. § 78l]."

13

184.    Rule 14a-9, promulgated pursuant to Section 14(a) of the Exchange Act, provides

14

that no proxy statement shall contain "any statement which, at the time and in the light of the

15

circumstances under which it is made, is false or misleading with respect to any material fact, or

16

which omits to state any material fact necessary in order to make the statements therein not false or

17

misleading." 17 C.F.R. § 240.14a-9.

18

185.    Under the direction and watch of the Individual Defendants, the 2020, 2021, 2022,

19

and 2023 Proxy Statements (the "Proxy Statements") failed to disclose, *inter alia*, that: (1) though

20

the Company claimed its officers and directors adhered to the Code of Conduct, the Individual

21

Defendants violated these policies either without waivers or without such waivers being disclosed;

22

and (2) contrary to the Proxy Statements' descriptions of the Board's and its committees' risk

23

oversight functions, the Board and its committees were not adequately exercising these functions

24

and were causing or permitting the Company to issue false and misleading statements.

25

186.    The Proxy Statements also failed to disclose, *inter alia*, that: (i) that the Company

26

overstated AFFO (and AFFO/share) by improperly classifying recurring CapEx as non-recurring

27

CapEx expenses in violation of its own stated guidelines and SEC rules and regulations; (ii) the

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

improper classification of CapEx materially misled investors into believing that Equinix was meeting, or beating, its AFFO guidance; and (iii) Equinix lacked adequate internal controls. As a result, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

187.    In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the Proxy Statements were materially false and misleading.

188.    The misrepresentations and omissions in the Proxy Statements were material to Company stockholders in voting on the matters set forth for stockholder determination in the Proxy Statements, including but not limited to the reelection of certain Director Defendants.  The 2020 Proxy was an essential link in Defendants' insulation from stockholder challenge.

189.    The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the 2020, 2021, 2022, and 2023 Proxy Statements.

### COUNT II

**Against the Individual Defendants
For Breach of Fiduciary Duty**

190.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

191.    The Individual Defendants owed the Company fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

192.    The Individual Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

193.    The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties. Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith by failing to implement and monitor adequate internal controls over the Company's financial reporting and, as a consequence, issuing or permitting the

issuance of materially false and misleading statements in the Company's SEC filings and other public disclosures. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

194.    Specifically, the Individual Defendants failed to disclose: (i) the Company overstated AFFO (and AFFO/share) by improperly classifying recurring CapEx as non-recurring CapEx expenses in violation of its own stated guidelines and SEC rules and regulations; (ii) the improper classification of CapEx materially misled investors into believing that Equinix was meeting, or beating, its AFFO guidance; and (iii) Equinix lacked adequate internal controls. As a result, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

195.    The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

196.    In further breach of their fiduciary duties, the Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and omissions of material fact referenced herein.

197.    As a direct and proximate result of the Individual Defendants' failure to fulfill their fiduciary obligations, the Company has sustained significant damages.

198.    As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company. As a direct and proximate result of the Individual Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill. Such damage includes, among other things, costs incurred in defending itself in the Securities Class Action, exposing the Company to millions of dollars in potential class-wide damages in the Securities Class Action, and damage to the share price of the Company's stock,

resulting in an increased cost of capital, and reputational harm.

199.    Plaintiff, on behalf of Equinix, has no adequate remedy at law.

## COUNT III

### Against the Individual Defendants for Aiding and Abetting Breach of Fiduciary Duty

200.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

201.    By encouraging and accomplishing the illegal and improper transactions alleged herein and concealing them from the public, the Individual Defendants have each encouraged, facilitated, and advanced their breach of their fiduciary duties.  In so doing, the Individual Defendants have each aided and abetted, conspired, and schemed with one another to breach their fiduciary duties, waste the Company's corporate assets, and engage in the ultra vires and illegal conduct complained of herein.

202.    Plaintiff, on behalf of Equinix, has no adequate remedy at law.

## COUNT IV

### Against the Individual Defendants For Unjust Enrichment

203.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

204.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Equinix.

205.    The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Equinix that were tied to the performance or artificially inflated valuation of Equinix, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

206.    Plaintiff, as a shareholder and a representative of Equinix, seeks restitution from the

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Individual Defendants and seeks an order from this Court disgorging all profits, benefits and other compensation procured by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

207.    Plaintiff, on behalf of Equinix, has no adequate remedy at law.

## COUNT V

### Against the Individual Defendants
### For Abuse of Control

208.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

209.    The Individual Defendants misconduct alleged herein constituted an abuse of their control over the Company, for which they are legally liable.

210.    As a direct and proximate cause of the Individual Defendants' abuse of control, the Company has sustained substantial damages.

211.    Plaintiff, on behalf of Equinix, has no adequate remedy at law.

## COUNT VI

### Against the Individual Defendants
### For Waste of Corporate Assets

212.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

213.    The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the time period in issue.  It resulted in continuous, connected, and ongoing harm to the Company.

214.    As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, *inter alia*: (i) paying and colleting excessive compensation and bonuses; and (ii) incurring potentially millions of dollars of legal liability and/or legal costs, including defending the Company and its officers against the Securities Class Action.

215.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

216. Plaintiff, on behalf Equinix, has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A. Awarding money damages against all Individual Defendants, jointly and severally, for all losses and damages suffered as a result of the acts and transactions complained of herein, together with pre-judgment interest, molded in a fashion to ensure the Individual Defendants do not participate therein or benefit thereby;

B. Directing all Individual Defendants to account for all damages caused by them and all profits and special benefits and unjust enrichment they have obtained as a result of their unlawful conduct, including all salaries, bonuses, fees, stock awards, options and common stock sale proceeds, and imposing a constructive trust thereon;

C. Awarding punitive damages;

D. Awarding costs and disbursements of this action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E. Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated: February 14, 2025

**WOLF HALDENSTEIN ADLER
FREEMAN & HERZ LLP**

By:  */s/ Alex J. Tramontano*
ALEX J. TRAMONTANO

Betsy C. Manifold
Rachele R. Byrd
Alex J. Tramontano
750 B Street, Suite 1820
San Diego, CA 92101
Telephone: (619) 239-4599
Facsimile: (619) 234-4599
manifold@whafh.com
byrd@whafh.com
tramontano@whafh.com

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**RIGRODSKY LAW, P.A.**
Herbert W. Mondros
1007 N. Orange Street, Suite 453
Wilmington, DE 19801
Telephone: (302) 295-5310
Email: hwm@rl-legal.com

**GRABAR LAW OFFICE**
Joshua H. Grabar
One Liberty Place
1650 Market Street, Suite 3600
Philadelphia, PA 19103
Telephone: 267-507-6085
Email: jgrabar@grabarlaw.com

*Attorneys for Plaintiff*

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## VERIFICATION

I, Boris Benkovski, have reviewed the allegations made in this Verified Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true. I further declare that I am a current holder, and have been a holder, of Equnix, Inc. common stock at all relevant times.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this _____ day of _____ 2025.

2/12/2025

_____

Boris Benkovski